591 A.2d 351

**MATHIES COAL COMPANY, Petitioner,**

**v.**

**WORKMEN'S COMPENSATION APPEAL BOARD (TAU), Respondent.**

Commonwealth Court of Pennsylvania.

Submitted on Briefs Aug. 31, 1990.

Decided May 14, 1991.

Carl J. Smith, Jr., Washington, for petitioner.

Theodore E. Breault, Pittsburgh, for respondent.

Before SMITH and PELLEGRINI, JJ., and SILVESTRI, Senior Judge.

PELLEGRINI, Judge.

Mathies Coal Company (Employer) files a Petition for Review appealing an Order of the Workmen's Compensation Appeal Board (Board) affirming a Referee's Decision granting the Fatal Claim Petition of Vickie Lynn Tau (Claimant).*

* This case was assigned to the authoring judge on March 21, 1991.

Claimant's deceased spouse, William P. Tau (Tau), worked for Employer as a utility man in the underground mine of the Employer. The utility man does all the odd jobs and gets "cuts" ready for the other miners. (29a).[1] Upon arrival at work on October 10, 1984, Tau and several members of the "crew" went down into the mine. (29a–30a). Upon arriving at the "face" of the area to be mined, Tau was requested by his foreman to get more fan cable so that the fan could be moved up to the next cut to mine coal. (33a). To get the cable, Tau had to go back about three hundred feet from the cut site. (33a) Thus, the cable had to be dragged by hand about 300 feet. The cable was 800 feet in length, 1 to 1½ inches thick, and had five smaller insulated wires inside with an encompassing thick rubber coating insulation. (34a, 43a–45a). The cable carries 440 volts of electricity to run the fan. (44a).

While Tau was getting the cable, a co-worker, Robert Troup (Troup), mined coal and completed a cut which took about 30 minutes. (47a, 62a). After completion of the cut, Troup turned around and saw a light on the floor about 100 feet away. (36a–38a, 63a). Troup ran to the light and found Tau lying on his back, unconscious. (41a). His legs were in a puddle of water a couple of inches deep. (39a–40a, 64a). He was not in contact with the cable, but it was lying next to him in loops. (41a–42a, 65a–67a). Tau had pulled the cable up close to the fan where he was found. (47a). Troup dragged Tau out of the water to a drier spot about ten feet away. (39a, 43a). While dragging Tau, Troup saw a "tape job" or splice where the cable had been repaired on one of the loops of the cable Tau had dragged to the fan. (35a, 44a, 65a–67a). Efforts to resuscitate Tau at the scene were unsuccessful and he was taken to Canonsburg Hospital where he was pronounced dead.

The next morning an autopsy was performed by Ernest L. Abernathy, M.D., and witnessed by Washington County Coroner Farrell Jackson. The gross diagnosis of the autopsy was that Tau died from a coronary hypoplasia and

1. The numbers in parentheses refer to the Reproduced Record.

arteriosclerosis. (464a–466a). The death certificate, signed by Dr. Abernathy and dated the same day, indicated death attributable to ventricular fibrillation, due to coronary insufficiency, due to coronary arteriosclerosis and hypoplasia. (419a). On October 11, 1984, Coroner Jackson wrote a letter to the Employer, further explaining the autopsy results. Coroner Jackson reiterated the causes of death set forth in the death certificate. (518a–519a). He also made the following statement:

> It has also been brought to our attention that he [Tau] was hanging miner cable of the 500 volt type, and I am not sure whether or not it was energized, but having this information and knowing of a past case which was considered a heart attack until we were able to determine it was electrocution, we examined Mr. Tau very closely for possible electrocution death. There was no indication found by the pathologist that he had in any way come in contact with any electric power source.

(518a–519a).

Despite the Coroner's findings to the contrary, Claimant filed a Fatal Claim Petition on June 28, 1986, alleging that her husband's death was due to cardiac arrhythmia produced by electric shock. (3a–4a). Following several hearings, the Referee issued a Decision concluding that Tau "died by virtue of an electrocution injury suffered within the scope and course of his employment which activated an arrhythmia in his heart already having a coronary heart disease called coronary hypoplasia" and awarded benefits. (13a). The Employer appealed the Referee's Decision to the Board which affirmed. The Employer now appeals the Board's Order.[2]

The Employer contends that Claimant has failed to satisfy her burden of proving by circumstantial evidence that Tau's death was caused by electrocution. The Employer

---

**2.** Our scope of review is limited to determining whether any finding of fact is not supported by substantial evidence, whether an error of law has been committed, or whether constitutional rights were violated. *Cashmark v. Workmen's Compensation Appeal Board (Great A & P Tea Company),* 135 Pa.Commonwealth Ct. 464, 580 A.2d 1189 (1990).

argues that the Referee's findings are not supported by substantial evidence, since Claimant's circumstantial evidence does not so preponderate in favor of the conclusions reached as to outweigh the results of the autopsy and other evidence and reasonable inferences therefrom to the contrary. The Employer further contends that the Referee erred by relying on the incompetent medical opinions of Claimant's expert witnesses, Joshua Perper, M.D., and Jay M. Ziegler, M.D., because their opinions were based upon a critical fact, Tau's contact with electricity, which is not in evidence.

In a workmen's compensation case, the claimant has the burden of proving that the injury arose in the course of employment and was casually connected with the claimant's work. *Northeastern Hospital v. Workmen's Compensation Appeal Board (Turiano)*, 134 Pa.Commonwealth Ct. 164, 578 A.2d 83 (1990); *Karsaba v. Workmen's Compensation Appeal Board (Bethlehem Steel Corp.)*, 71 Pa. Commonwealth Ct. 303, 454 A.2d 682 (1983). In the present case, although the Claimant has presented direct evidence that Tau had been carrying the cable prior to his death, there is no direct evidence that Tau actually came in contact with electricity or that the cable was energized. Thus, Claimant must prove that Tau died because of electrocution through circumstantial evidence.

In *Smith v. Bell Telephone Company of Pennsylvania*, 397 Pa. 134, 138, 153 A.2d 477, 480 (1959), the Pennsylvania Supreme Court stated that:

> When a party who has the burden of proof relies upon *circumstantial evidence and inferences reasonably deducible therefrom,* such evidence, in order to prevail, must be adequate to establish the conclusion sought and must so preponderate in favor of that conclusion as to outweigh in the mind of the fact-finder any other evidence and reasonable inferences therefrom which are inconsistent therewith. (Emphasis added.)

Moreover, evidence of an accident causing injury may be shown by direct or circumstantial evidence; in the latter

instance, there must be a clear and logical indication of its occurrence. *Adamchick v. Wyoming Valley Collieries Co.*, 332 Pa. 401, 3 A.2d 377 (1939); *Evancik v. Coal Mining Co. of Graceton*, 150 Pa.Super. 27, 27 A.2d 767 (1942).

Troup, Tau's co-worker, testified that he found Tau lying in a couple of inches of water a few feet from the fan. (39a–40a, 64a). He stated that Tau's body was cold, muddy and wet. (39a). He also stated that Tau was not wearing gloves and his hands were cold, muddy and wet. (39a, 41a, 68a–69a, 73a–74a). Troup further stated that Tau was unconscious and did not speak with him. (36a, 40a, 68a).

Troup also testified that the cable was lying in loops near Tau's body, evidence that Tau had been pulling the cable up to the fan. (34a–36a, 39a, 41a–44a, 63a–67a). He testified that the cable was wet and muddy and had a "tape job" on one of the loops near Tau's body, where it had been repaired. (35a, 43a–45a, 67a). He also stated that the cable carries 440 volts of electricity when energized. (44a).

Troup offered further testimony that it looked as if Tau may have been trying to put the cable up around the fan. (47a–48a). This would be done to make it easier to move the fan. (48a). Troup further testified that he found Tau and the cable next to a "buggy" route. (47a, 76a–77a, 83a). Troup stated that a "buggy" had previously passed by prior to when he discovered Tau. (47a). He stated that the "buggies" run on power from cables which winds up itself behind the "buggy." (47a–48a).

The Claimant testified that when she identified her husband's body, he had a black mark on his right ear which was not present when he left for work. (363a, 369a). When she touched the black mark, no discoloration came off onto her fingers, as would coal dust or dirt. (369a–370a). She also testified that his clothes were wet and he had holes in the soles and sides of his boots. (366a–369a). She also stated that her husband had told her two weeks earlier that

he was shocked in the mine while loading a "buggy." [3] (374a). Finally, the Claimant testified that her husband's only previous health problems were related to kidney stones and his gallbladder. (370a–373a).

The Claimant also introduced several exhibits consisting of Citation/Orders issued by the U.S. Department of Labor, Mine Safety and Health Administration (MSHA) as part of its investigation into Tau's death. Five Mine Citation/Orders were issued to the Employer: one for inadequate records of weekly electrical exams; one for permitting standing water to accumulate in the mine; two for improper grounding of the power systems in the mine; and one for inadequate insulation of the fan power cable. (428a–435a).

The first Citation/Order indicated that the Employer's record of the weekly electrical exam was incomplete because it did not include an examination of the auxiliary exhaust fan and testing of the grounds on the "buggy" cars used in that section. (431a). The second Citation/Order required that standing water be removed from the section. (428a). The third Citation/Order indicated that the ground phase relay for the distribution box located in the section was improper since it was set to operate in excess of one second instead of instantaneously. (433a). The fourth Citation/Order indicated the same problem with the ground phase relay system providing power to the continuous miner. (434a). Finally, the fifth Citation/Order indicated that the power cable serving the auxiliary exhaust fan was not adequately insulated, and that a hole was discovered which would burn when power was applied. (435a).

 We find this evidence sufficient to support a finding by the Referee that Tau had, in fact, been electrocuted.[4]

---

3. Hearsay evidence such as this is admissible, even over objection, if relevant and material to the facts at issue, to be considered for the additional light it sheds on the matter. *First National Bank of Dunmore v. Workmen's Compensation Appeal Board (Trotta)*, 110 Pa.Commonwealth Ct. 370, 532 A.2d 526 (1987).

4. The Claimant had also presented expert medical testimony to show that her husband's death resulted from electrocution. She introduced the testimony of Dr. Perper and Dr. Ziegler. Dr. Perper, a specialist in

As the factfinder, the Referee can reasonably draw this inference from the circumstantial evidence presented. *See Smith v. Bell Telephone.* The Employer contends, however, that this circumstantial evidence, including the medical testimony, does not "so preponderate as to outweigh" the opposite conclusions reached by the coroner and the MSHA's investigation that Tau's death was the result of natural causes. We find sufficient evidence of record which the Referee, in his exercise of discretion and factfinding, could rely to negate the results of the autopsy, and the same conclusion in the MSHA reports, so as to cause them to be outweighed by the circumstantial evidence of electrocution.

Both of the Employer's expert medical witnesses found problems with the autopsy. Richard L. Heppner, M.D., testified that the autopsy did not include a microscopic examination of the tissues, the absence of which would not meet the criteria of a generally accepted comprehensive medical examination. (277a, 279a). Dr. Heppner stated that the organs were not measured or weighed precisely, nor was there an examination of the brain. (279a, 285a, 300a). He stated that the autopsy was a gross examination as opposed to a microscopic one. (279a). He also stated

forensic pathology, testified that "[i]n my opinion, Mr. Tau died either of electrocution either directly or through the activation of an arrhythmia in a predisposed heart with coronary arteriosclerosis and coronary artery hypoplasia." (104a). Dr. Perper based this opinion on the facts he reviewed which indicated Tau came in contact with electricity. (104a–107a).

The Claimant also presented the expert medical testimony of Dr. Ziegler. Dr. Ziegler, who had been Tau's physician since 1981, testified that based on all the information, his opinion, within a reasonable degree of medical certainty, was that Tau suffered a cardiac arrhythmia produced by electrical shock. (186a, 202a, 206a).

The Employer contends, however, that the opinions of Claimant's expert medical witnesses are incompetent, because they are based on a critical fact, contact with electricity, not in evidence. While we do not disagree with this proposition, we do not find it fatal to Claimant's case. Since there was sufficient circumstantial evidence that Tau came in contact with electricity, and the expert medical testimony does not dispute that Tau's death would have resulted had he come in contact with it, the Referee's finding of death by electrocution should stand.

that the findings regarding Tau's heart are inconsistent with his understanding of normal cardiac development and medical literature. (281a, 295a,, 298a–300a). Dr. Heppner then cited electrocution as one of several possible explanations for Tau's death. (284–285a, 301a, 526a).

Harvey Mendelow, M.D., also testified as a expert medical witness for the Employer. Dr. Mendelow testified that his observation was "extremely limited both in terms of the extent of examination, the lack of examination in certain critical areas, and the lack of significant numbers of types of microscopic sections to delineate completely the pathology that was present, if any." (315a). He states that there were no measurements or microscopic slides to support the autopsy's finding regarding Tau's heart, and that such slides are vital. (316a–318a, 330a, 333a). He also testified that he has never heard of, nor was able to find in medical literature, the specific medical diagnosis made by the autopsy. (318a–319a).

Dr. Mendelow further stated that he could not draw a firm conclusion as to cause of death, because no examination of the brain was done and there was insufficient measurements and microscopic evidence of the heart. (324a–325a, 330a). He concludes, stating that he could not, within a reasonable degree of medical certainty, establish a cause of death. (330a–331a).

Claimant's medical expert, Dr. Perper, a certified pathologist, testified that he had written an article entitled "Electrical Injuries" published in the Legal Medicine Annual in 1976. (89a, 161a, 164a–174a). In his conclusion, Dr. Perper states: "In a majority of cases, electrical injuries are easily recognized *microscopically*. In diagnosing doubtful electrical marks, however, the microscopic examination of electrocution injuries is *indispensable*." (Emphasis added.) (173a). Dr. Perper stated that the autopsy failed to mention the black mark Claimant saw on Tau's ear, and an analysis of such a mark, if recognized by the coroner, would have been very important in confirming whether it was the site of the entrance or the exit of the electrical current. (100a,

113a). Dr. Perper testified that he was thus unable to examine any microscopic sections of tissue because they were unavailable. (113a–114a). Dr. Perper also stated that Tau's brain was not examined, contrary to the normal procedure during an autopsy. (116a).

Dr. Perper further testified that the possible reason the hospital doctors or the coroner did not find or overlooked evidence of electrocution marks could have been due to the fact that Tau's skin was wet, lowering the electrical resistance, and thus, leaving little or no visible marks. (105a–108a). He stated that Tau could have been electrocuted by touching the cable where it was damaged, through an electrical current travelling through the water or by an arc of the current from the cable to his body. (145a–149a).

Claimant's other medical expert, Dr. Ziegler, testified that there was an absence of critical findings in the autopsy report. (206a). He states that the death certificate and autopsy reports are inconsistent with one another because the autopsy mentions a "recent small coronary occlusion" but the death certificate did not. (208a). He also indicated that the autopsy did not make mention of the black mark on Tau's ear. (247a).

As for the MSHA reports, which indicate death by natural causes, the documents merely refer to the autopsy results and a report from the coroner's office. (421a, 423a). The MSHA reports do not indicate that any independent medical examination was done other than the autopsy. Thus, the weight accorded the conclusion in these reports is dependent on the weight accorded the autopsy findings by the Referee, which, as discussed, would certainly be reduced when the expert medical testimony is considered.

The Referee's finding that Tau's death was a result of electrocution during the course of his employment with the Employer is supported by clear and logical inferences from the circumstantial evidence presented. Accordingly, we affirm the Order the Board.

## ORDER

AND NOW, this 14th day of May, 1991, the Order of the Workmen's Compensation Appeal Board dated February 14, 1990, is affirmed.

SILVESTRI, Senior Judge, dissenting.

Because I believe Claimant's fatal claim petition should be dismissed, I respectfully dissent from the majority. In support thereof, I submit the following.

Mathies Coal Company (Employer) petitioned for review of an order of the Workmen's Compensation Appeal Board (Board) which affirmed the decision of the referee and granted the fatal claim petition of Vickie Lynn Tau (Claimant).

Claimant's deceased spouse, William P. Tau (Tau), worked for Employer as a utility man in the underground mine of the Employer. The utility man does all the odd jobs and gets "cuts" ready for the other miners. Upon arrival at work on October 10, 1984, Tau was advised that there was going to be a need for some fan cable for the fan used in the next cut. Tau was requested to get the cable so that the fan could be moved up to the next cut to mine coal.

To get the cable, Tau had to go back about three hundred feet from the cut site. Thus, the cable had to be dragged by hand about 300 feet. The cable was 800 feet in length, 1 to 1½ inches thick, and had five smaller insulated wires inside with an encompassing thick rubber coating insulation.

While Tau was getting the cable, a co-worker, Robert Troup (Troup) mined coal and completed a cut which took about 30 minutes. After completion of the cut, Troup turned around and saw a light on the floor about 100 feet away. Troup ran to the light and found Tau lying on his back, unconscious. His legs were in a puddle of water a couple inches deep. He was not in contact with the cable. Troup dragged Tau out of the water to a drier spot about ten feet away. While dragging Tau, Troup saw a tape job

or splice on one of the loops of the cable Tau had dragged to the fan.

Tau was taken to Canonsburg Hospital where he was pronounced dead. The death certificate, dated the following day, indicated death attributable to ventricular fibrillation; coronary insufficiency; and coronary arteriosclerosis and hypoplasia.

The coroner indicated that the pathologist found no indication that Tau had in any way come in contact with any electrical power source. The possibility of death by electrocution had been closely monitored when Tau's examination was performed because the coroner knew of a past case that was considered a heart attack until it was determined to be electrocution.[1] The coroner's report stated that the "deceased was closely examined for any trauma or electrical shock and none was found."[2] Death was indicated to be due to natural causes.

Despite those findings, Claimant filed a fatal claim petition on June 28, 1986[3] alleging Tau's death was due to cardiac arrhythmia produced by electric shock.[4]

After hearings, at which all the testimony, except the Claimant's testimony, was presented by depositions and exhibits, the referee concluded that Tau "died by virtue of an electrocution injury suffered within the scope and course of his employment which activated an arrhythmia in his

1. Coroner's letter dated October 11, 1984 indicates:
 It has also been brought to our attention that he was hanging miner cable of the 500 volt type and I am not sure whether or not it was energized, but having this information and knowing of a past case which was considered a heart attack until we were able to determine it was electrocution, we examined Mr. Tau very closely for possible electrocution death. There was no indication found by the pathologist that he had in any way come in contact with any electric power source.
 See Defendant's Exhibit B, R.R. at 518a–520a.

2. See Defendant's Exhibit B, R.R. at 517a.

3. The fatal claim petition was filed pursuant to provisions in The Pennsylvania Workmen's Compensation Act, Act of June 2, 1915, P.L. 736, *as amended,* 77 P.S. §§ 1–1031.

4. R.R. at 31.

heart already having a coronary heart disease called coronary hypoplasia" and awarded benefits.

Employer filed an appeal of the referee's decision and a petition for supersedeas to the Board. The Board affirmed the decision of the referee and dismissed the appeal of the Employer.[5]

The Employer filed a timely petition for review. Employer presents several arguments for consideration.[6] First, Employer asserts the medical opinions of Dr. Joshua Perper and Dr. Jay M. Ziegler, relied upon by the referee, are not substantial competent evidence because those opinions are based upon facts not in evidence in the case. Second, Employer argues that the referee's reliance upon the expressed opinions of Drs. Perper and Ziegler constitutes an error of law as the objections to their respective opinions were not sustained. Further, it is argued that the finding of "death by electrocution" was not supported by substantial competent evidence because the record contains no evidence of contact with electricity. An exhaustive review of the record in its entirety demonstrates the merit of Employer's contentions.

In workmen's compensation cases, the claimant has the burden of proving that an injury arose in the course of employment and was causally connected with the claimant's work (Tau, in the instant case). In short, the claimant has the burden to prove all the elements establishing eligibility for benefits. *Northeastern Hospital v. Workmen's Compensation Appeal Board*, 134 Pa. Commonwealth Ct. 164, 578 A.2d 83 (1990); *Westinghouse Electric Corporation v. Workmen's Compensation Appeal Board*, 129 Pa.Commonwealth Ct. 218, 565 A.2d 204 (1989); *Karsaba v. Work-*

5. The record does not reveal disposition of the petition for supersedeas.

6. In compensation cases of this kind, our scope of review is confined to a determination of whether errors of law were made, whether findings necessary to support the decision are supported by substantial evidence or whether constitutional rights have been violated. *Estate of McGovern v. State Employee's Retirement Board*, 512 Pa. 377, 517 A.2d 523 (1986).

*men's Compensation Appeal Board (Bethlehem Steel Corporation),* 71 Pa. Commonwealth Ct. 303, 454 A.2d 682 (1983). The only witnesses called by Claimant to meet her burden were herself; Troup, by way of deposition; Dr. Perper, by way of deposition; and Dr. Ziegler, by way of deposition. None of these individuals were witnesses to the performance of Tau's work or working conditions at the time of his death. Although some of the physical circumstances of the workplace were testified to by Troup, Tau's death and the events preceding it were unwitnessed.

Because there is no direct evidence in the record of this case, Claimant must prove her case by circumstantial evidence, as was accurately determined by the Board. To satisfy her burden of proof Claimant must establish that the cable in question was electrically "energized" and that electricity escaped from the cable in sufficient amount to cause an electric shock or electrocution. With circumstantial evidence, Claimant must produce evidence that so preponderates in favor of the conclusion reached that it outweighs any other evidence and reasonable inferences drawn from such evidence. *Smith v. Bell Telephone Co. of Pa.,* 397 Pa. 134, 153 A.2d 477 (1959).

Furthermore, because of the technical nature of the facts involved in a case of death allegedly due to electrocution, expert testimony is necessary. An expert is defined as one who possesses knowledge not within the ordinary ken who, because of this knowledge, is qualified to testify about a particular topic. *Hawthorne v. Dravo Corp.,* 352 Pa.Superior Ct. 359, 508 A.2d 298 (1986). Expert testimony is utilized to aid the trier of fact in his attempt to ascertain the truth.

An expert can express an opinion as to the cause of an accident only if his testimony is based upon a personal observation made of the scene of the accident or if he responds to hypothetical questions based upon certain assumptions. Such assumptions are to be based upon facts which the finder of fact would be warranted in finding from the evidence. *Houston v. Canon Bowl Inc.,* 443 Pa. 383, 385, 278 A.2d 908, 910 (1971). Qualifications of an expert

are reviewed with caution because though "it may appear that the scope of the witness's experience and education may embrace the subject in a general way, ... the subject may be so specialized that even so, the witness will not be qualified to testify." *Dambacher v. Mallis*, 336 Pa.Superior Ct. 22, 43, 485 A.2d 408, 418 (1984).

With these established premises in mind I first address the qualifications of Dr. Perper to express his opinion as to whether or not Tau was electrocuted or sustained electrical shock. Dr. Perper presented an impressive curriculum vitae which included formal education in medicine, specialized education in pathology, and forensic pathology and law. He then listed extensive academic appointments, memberships in medical societies, public offices held, medical committees on which he served, boards on which he served, certifications and awards received, titles of books of which he was either author or co-author, and lastly, 51 publications of which he was author or co-author. With one exception, there is nothing in his curriculum vitae which remotely suggests that he has special knowledge, either by training or experience, about the properties, characteristics and functioning of electricity in a given environment.

The one exception that Dr. Perper points to in his testimony is an article he authored in 1976 entitled, *Electrical Injuries.*[7] The introduction to the article indicates that it is essential for all forensic pathologists "to have a basic understanding of electrical principles and concepts in order to apply them to biologic examinations of bodies and physical examinations of scenes."[8] I note that Dr. Perper 1) was not identified as having a background in electrical principles, 2) did not do an examination of the body, and 3) did not conduct a physical examination of the scene. Hence, Dr. Perper was not qualified to render an opinion in this case.

In addition to finding that Dr. Perper was not qualified to render an opinion, an additional basis exists for exclusion of

7. Published in the Medical–Legal Annual in 1976 at pp. 133–143. (Also Perper Deposition Exhibit 2.)

8. R.R. at 164a–165a.

his testimony. In a report dated June 15, 1986, Dr. Perper concluded that Tau's death was attributable to electrocution or electric shock which directly or indirectly produced a heart arrhythmia. Dr. Perper's conclusion was based upon information he received via certain documents in the case. He testified that he reviewed the deposition of a co-worker, Robert J. Troup; medical reports; the autopsy report; the investigation of death by the United States Department of Labor.[9, 10]

On the basis of these documents, Dr. Perper garnered and relied upon the following "facts" in reaching his conclusion. To Mr. Troup, the co-worker, he attributed the "fact" that Tau "was probably holding the cable where the tape was." [11] Dr. Perper also relied upon the "fact" that there was "information that on another occasion when there would be a bad splice in the cable and somebody would pick the wet cable as far as 25 feet away with bare hands he would experience an electrical shock." [12] Dr. Perper also referred to several statements of information from a Mr. Hamilton.[13] He further took into consideration the "fact" that the cable had "an uninsulated area." [14]

9. R.R. at 90a–91a.

10. Dr. Perper relied upon reports of James Bandish, a federal mine inspector. Claimant's Exhibit 2. The orders and citations issued by Bandish are technical in nature and were never explained or related to Tau's death by Dr. Perper.

11. R.R. at 97a.

12. R.R. at 99a.

13. R.R. at 100a. Dr. Perper testified: "Mr. Hamilton mentioned that perhaps Mr. Tau was picking up the cable over his right shoulder and carrying it in various loops, which is the way in which most of the miners carry it. He also mentioned that Mr. Tau could have been in the water with his boots which, as mentioned before, had holes, when the electricity arced from the cable to his ear where the mark was.
 "Mr. Hamilton also mentioned that Mr. Tau could have been shocked while pulling the cable and bumping into a supply car and/or the scoop, both of which there was DC voltage, and might have received a small shock. And he also mentioned the possibility to be shocked from a hot cable simply lying in the water."

14. R.R. at 106a.

In reality, not one of the above-referenced "facts" was ever established in this case. Mr. Troup's testimony indicated he did not know if Tau had touched the spliced area.[15] No witness named "Hamilton" ever testified or was even identified in the case. No witness ever testified regarding a person being shocked from 25 feet away. The above "facts" referenced by Dr. Perper, and relied upon in reaching his conclusion, are not evidenced in the record. As indicated earlier, no proof was submitted to prove that Tau ever came into contact with electricity.

Thus, the testimony of Dr. Perper was based not on fact, but upon assumptions and conjecture. It is a well-established and fundamental premise that courts of this Commonwealth do not permit experts to base their opinions on facts not in evidence. Neither is it permissible for an expert's opinion to constitute proof of the facts necessary to support that opinion. *Collins v. Hand*, 431 Pa. 378, 246 A.2d 398 (1968).

> The opinion must be an intelligent and reasonable conclusion based on a given state of facts, and be such as reason and experience have shown to be a resulting consequence of the facts proved. The basis of the conclusion cannot be deduced or inferred from the conclusion itself. *In other words, the opinion of the expert does not constitute proof of the existence of the facts necessary to support the opinion.*

*Collins*, 431 Pa. at 390, 246 A.2d at 404, quoting *Dreher v. Order of United Commercial Travelers of America*, 173 Wis. 173, 180 N.W. 815 (1921) (emphasis in original).

In contravention to the premise in *Collins*, Dr. Perper's opinion was used to establish proof of the facts necessary to support the opinion itself. Employer objected to Dr. Perper's expression of an opinion which relied upon information not established as proof in the case.[16] The referee's reliance upon objected to, unruled upon testimony was in error.

15. R.R. at 53a–54a, 66a.
16. R.R. at 104a.

Referring again to the article on electrical injuries, I note that Dr. Perper concluded the publication as follows:

In the majority of cases, electrical injuries are easily recognized microscopically. In diagnosing doubtful electrical marks, however, the *microscopic examination* of electrocution injuries *is indispensable*. While the microscopic changes are not pathognomonic in most instances, their characteristics coupled with gross morphologic changes, the circumstantial evidence, and the clinical history are essential in confirming the diagnosis of electrocution. (Emphasis added).[17, 18]

No tissue slides made from either internal or external tissue of Tau's body were available for microscopic examination as none were made. Dr. Perper's conclusion of death attributable to electrocution or electric shock was made without an examination of microscopic slides. Thus, by his own standard for determination of electrical injuries, Dr. Perper vitiates his own conclusion.

The absence of any pretense to specialized knowledge of the behavioral characteristics of electricity or electrical conduction, the lack of a physical examination of either Tau's body or the scene of the incident, the reliance upon facts not in evidence, combined with the absence of microscopic slides, the examination of which is "indispensable" according to the article, renders Dr. Perper's opinion invalid.

Similarly, in formulating his opinion that Tau's death was attributable to electric shock or electrocution, the testimony of Dr. Jay Ziegler, also introduced via deposition, relied upon the same evidence as Dr. Perper which was not established in the record. As in the case with Dr. Perper, I find no factual basis for Dr. Ziegler's opinion.

**17.** Dr. Harvey Mendelow, Employer's expert, agrees with Dr. Perper's conclusion that examination of slides is indispensable. R.R. at 333a.

**18.** Stedman's Medical Dictionary, 25th edition, defines pathognomonic as "[c]haracteristic or indicative of a disease" and morphology(ic) as "[t]he science concerned with the configuration or the structure of animals and plants."

Likewise, Dr. Ziegler was not qualified to express an opinion that Tau's death was attributable to electrocution. Dr. Ziegler's specialty was in family practice. He testified that he dealt with cardiology for two months during his three year residency and that he had no special training in pathology. Unlike Dr. Perper, Dr. Ziegler did not even attempt to demonstrate any special knowledge of electrical injuries; neither did he demonstrate any knowledge or experience in electrical engineering and/or the functioning of electrical energy. As has already been passed upon by this Court, "a witness who demonstrates by his own testimony that he has no experience or special knowledge of the matter at issue is incompetent as an expert." *Marlowe v. Lehigh Township*, 64 Pa.Commonwealth Ct. 587, 593, 441 A.2d 497, 499–500 (1982) citing *Steele v. Shepperd*, 411 Pa. 481, 484, 192 A.2d 397, 398 (1963). As in the case with Dr. Perper, I find insufficient qualifications to allow Dr. Ziegler to render an opinion.

In addressing the referee's failure to exclude the hearsay evidence relied upon by Drs. Perper and Ziegler I refer to the rules of administrative procedure. Section 35.151, 1 Pa.Code § 35.151, provides:

No part of a deposition may constitute a part of the record in the proceeding, unless received in evidence by the agency head or presiding officer. Objection may be made at the hearing in the proceeding to receiving in evidence a deposition or part thereof for a reason which would require the exclusion of the evidence if the witnesses were then present and testifying.

Section 131.45(a), 34 Pa.Code § 131.45(a), referring to admissibility of oral depositions, indicates that all objections must be made and the reasons for such objections stated at the time the depositions are taken.

During each of the respective depositions when Claimant's counsel asked Drs. Perper and Ziegler what their opinions were as to the cause of Tau's death, counsel for Employer objected to their expressing their opinions and stated the reasons for the objection. At the time of the

depositions there was no presiding officer of the agency present to rule on the Employer's objections. However, when the deposition of Dr. Perper was offered into evidence before the referee, Employer's counsel stated that he was not waiving any of the objections raised at the deposition. While this was not specifically done at the time the deposition of Dr. Ziegler was admitted into evidence before the referee, it is clear that Dr. Ziegler relied on the same matters as did Dr. Perper.

Administrative practice and procedure provides that an officer shall rule upon the admissibility of evidence. 1 Pa.Code § 35.162. As a general rule, the use of the word shall is construed to mean that the subject action is imperative. *Amalgamated Transit Union, Division 85 v. Port Authority of Allegheny County,* 417 Pa. 299, 208 A.2d 271 (1965); *Burrows v. State Employes' Retirement Board,* 76 Pa. Commonwealth Ct. 84, 463 A.2d 106 (1983). The referee in his adjudication did not rule on the objections in the depositions of Dr. Perper and Dr. Ziegler. In his findings of fact and conclusions of law, the referee accepted and relied upon the objected to testimony of Drs. Perper and Ziegler. It was error for the referee to do so. All of the critical facts and evidence upon which Drs. Perper and Ziegler relied was hearsay. Thus, the referee's failure to comply with the above referenced section resulted in the admission of hearsay evidence into the record which was the only basis for establishing death due to electrocution or electric shock.

While cognizant of the fact that state agencies are not bound by technical rules of evidence at agency hearings, 2 Pa.C.S. § 505, this Court has previously determined that the hearsay rule is not a technical rule of evidence but a fundamental rule of law which ought to be followed by administrative agencies at those points in their hearings when facts crucial to issue are sought to be placed upon the record and objection is made thereto. *Pennsylvania State Board of Medical Education and Licensure v. Contakos,* 21 Pa.Commonwealth Ct. 422, 346 A.2d 850 (1975); *Bleile-*

*vens v. State Civil Service Commission,* 11 Pa.Commonwealth Ct. 1, 312 A.2d 109 (1973). As has been established, hearsay evidence admitted without objection may support a finding in an administrative agency proceeding only if corroborated by other competent evidence in the record. Hearsay evidence, properly objected to, is *not* competent to support a finding in an agency determination. *Burks v. Department of Public Welfare,* 48 Pa.Commonwealth Ct. 6, 408 A.2d 912 (1979). Further, this Court recently added the restriction that objected to hearsay evidence cannot be corroborated with unobjected to hearsay evidence. *Fairfield Township Volunteer Fire Company v. Human Relations Commission,* 133 Pa.Commonwealth Ct. 45, 575 A.2d 152 (1990).

I now turn to consideration of the substantial evidence argument posited by Employer. The record reveals no evidence, either direct or circumstantial, that the cable being dragged by Tau was "live"; that is, that it had an electrical current running through it. I reach this conclusion because there is no evidence that the cable was plugged into or attached to the fan. Indeed, Troup testified that the fan was not running. Neither is there evidence of the cable being plugged into a power source at its opposite end; nor is there evidence that there was electricity in the cable when it was being dragged by Tau. Drs. Perper and Ziegler assumed that there was electricity in the cable. Even assuming such information, there was no evidence from which one could conclude that electricity escaped the cable. Thus, there was no basis for the determination that Tau suffered an electrical shock or sustained electrocution from the cable or fan.

To the contrary, examination by the coroner as well as the autopsy report revealed Tau's death was due to a heart condition (natural causes) and was not due to electrocution. I find no evidence, circumstantial or otherwise, which "so preponderates" in favor of a finding of death due to electrocution or electric shock. For all of the foregoing reasons, I

would reverse the Board and dismiss the fatal claim petition of Claimant.